# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DANIEL SCHMIDT,

Petitioner,

v.         Case No. 18-CV-29

BRIAN FOSTER,

Respondent.

## REPORT AND RECOMMENDATION

### 1. Facts and Procedural History

On the morning of May 19, 2009, Holly Kleczka arrived at the home of her friend, Kimberly Rose, in the rural town of Gillette, Wisconsin. She knocked but received no answer. The friends had spoken within the hour and Rose had told Kleczka she would leave the door unlocked; if she did not answer, Kleczka should just come in. Kleczka entered through the unlocked door, sat her two children on the couch, and turned the television on for them before continuing through the home, calling for her friend. Kleczka pushed open the partially closed door to Rose's bedroom and there found Rose, sitting on the floor against the wall, covered in blood, dead.

Kleczka ran from the home, locked her children in her car, and called 911. Paramedics arrived, followed shortly thereafter by a police officer. After seeing Rose, the police officer told the paramedics to leave the home with him. It was only when other law enforcement officers arrived that they checked to see if anyone else was in the home. In doing so, they entered another bedroom and found a man lying on a mattress and covered with a blanket, seemingly asleep. The man did not respond to the officers' commands, and only after an officer removed the blanket did the officers recognize a hole in his back. Leonard Marsh, Rose's brother, was also dead. Rose had been shot once and Marsh three times, all with a 20-gauge shotgun.

Investigators learned that Rose had talked to her mother from 10:12 to 10:19 AM that morning. When Rose's mom called back at 10:47 AM, there was no answer. Kleczka found Rose shortly thereafter. Because there were no signs of forced entry and it did not appear anything was missing from the home, investigators suspected that they were murdered by someone who knew at least one of them.

Investigation into Rose's ex-boyfriend revealed he was over two hours away at the time of the murders. And Marsh's boyfriend, with whom Marsh had recently gotten into a fight, was also over two hours away. The investigation then turned to Daniel Schmidt, with whom Rose had been having an affair.

Schmidt's wife, Stephanie, had recently found out about the affair. In an argument about the affair on May 15, four days before the murders, Schmidt told his wife, "I'd like

to shoot her, then myself." (ECF No. 10-13 at 199.) Although Schmidt and Stephanie agreed to continue with their marriage despite the affair, Stephanie felt Rose was making it difficult. For example, Rose told Stephanie upsetting details of the affair, including that she and Schmidt had had sex in the Schmidts' home and in Stephanie's car. On hearing that they had had sex in her car, on May 17, 2009, Stephanie drove to the farm where Schmidt worked and angrily confronted him, taking off her wedding ring and throwing it at him.

Also on May 17, 2009, Rose sent Stephanie a text message with words to the effect of "pay back is a bitch," attached to which was a photograph. Stephanie was unable to view the photograph on her phone but understood it was an image of Schmidt and Rose. Upon learning that Rose kept a journal that included details of her affair with Schmidt, Stephanie demanded to see it. Stephanie arranged to get the journal from Rose on May 21. No such journal was found in Rose's home after her death.

Rose had also loaned Schmidt $1,000 for a motorcycle. The loan created tension between Schmidt and Stephanie because it required Schmidt to continue to have contact with Rose. Moreover, Stephanie had just lost her job, straining the Schmidts' ability to repay the loan. In light of the Schmidts' financial circumstances, Rose had agreed to accept an installment payment in the form of marijuana, which Schmidt grew in his garage. But Rose was dissatisfied with the quality and quantity of the marijuana and was demanding to be fully compensated.

The night before the murders, on May 18, 2009, Rose's 11-year-old son awoke at about 11:00 PM. He saw a man and a woman sitting on the couch in his home, arguing with his mother about money and marijuana. Although he was familiar with Schmidt and Stephanie, he could not see the faces of these visitors. Rose's son went back to his room and looked outside. He saw a green and silver pickup truck in the driveway, which is consistent with the truck that Schmidt drove. However, Rose's son's recollection of this night varied over time. For example, at a preliminary hearing he testified that he could not see the color of the truck. Stephanie denied that she went to Rose's home that night.

Around this same time—roughly 11:00 PM on May 18, 2009—Marsh called a friend, asking her to pick him up from Rose's house. Marsh was very upset and crying. Marsh told his friend that a man and woman whom he did not like were at his house, and he wanted to leave. His friend could hear a woman telling Rose to "shut up" and heard some discussion about money. Marsh told his friend their names, but she could not recall them other than that the man's name was short and the woman's name was long. A few hours later, around 1:00 AM on the morning of May 19, Rose called Marsh's twin brother, asking him to pick up Marsh because she and Marsh were fighting. He refused, saying it was too late and too far of a drive.

On May 19, Schmidt got home from work as he usually did between 9:15 and 9:30 AM, and soon told Stephanie he was going to pick up their daughter from preschool. This struck Stephanie as odd because it was only 9:30 and their daughter did not need to be

picked up until 11:00 AM. Nonetheless, Schmidt left, alone, and returned home at about 10:30 or 10:35, telling his wife he went for a drive to clear his mind. Uncharacteristically, when he returned he parked the car in the garage. A neighbor of the Schmidts testified he saw Schmidt arrive home at 10:37 and park in the garage. Schmidt then left again at about 10:40 or 10:45, this time taking his pickup truck and the couple's young son to get their daughter from preschool. The drive from Schmidt's home to Rose's home would be about 21 minutes each way if the driver drove the speed limit and came to a complete stop at all stop signs.

Later, Schmidt told Stephanie that on his drive he went to a friend in a nearby town. He told her the route he took, and Stephanie went to businesses along the route to see if any surveillance camera might have captured images of his car. After a business reported to her that it reviewed its security footage but did not see the car, Schmidt told Stephanie that maybe he took a different route to his friend's house. He told investigators that he started to drive to a friend's house but realized he did not have enough time to make it back in time to get his daughter from preschool, and so turned around and went home.

Schmidt had owned a 20-gauge shotgun. When questioned by law enforcement, he lied and said he had sold the gun years ago. Schmidt actually gave his 20-gauge shotgun to a friend the day after the murders, and the friend destroyed it.

Schmidt was not charged until September of 2012, over three years later. Beginning on October 11, 2013, the state presented its circumstantial case against Schmidt to a jury. On October 17, 2013, the jury found Schmidt guilty of two counts of first-degree intentional homicide. The court sentenced Schmidt to two consecutive terms of life in prison without the possibility of extended supervision. (ECF No. 10-1.)

Schmidt appealed, and the Wisconsin Court of Appeals affirmed his conviction. *State v. Schmidt*, 2016 WI App 45, 370 Wis. 2d 139, 884 N.W.2d 510. The Wisconsin Supreme Court denied Schmidt's petition for review.

Proceeding pro se, Schmidt filed a petition for a writ of habeas corpus. He presents three grounds for relief. First, he argues he was denied his right to present a defense when the trial court refused to let him present testimony from a child psychologist regarding child memory. Second, the trial court erred in finding that he waived spousal privilege. Third, there was insufficient evidence to sustain his conviction for the murder of Marsh.

The court reviewed Schmidt's petition in accordance with Rule 4 of the Rules Governing Section 2254 cases and ordered the respondent to answer the petition. (ECF No. 5.) The court also ordered Schmidt to submit a brief. (ECF No. 5.) The respondent answered the petition (ECF No. 10), but Schmidt did not submit a brief. Therefore, the briefing on Schmidt's petition is closed and the matter is ready for resolution.

## 2. Standard of Review

A federal court may consider habeas relief for a petitioner in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Following the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court generally may grant habeas relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Miller v. Smith*, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1), (2)).

## 3. Analysis

### a. Right to Present a Defense

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324, (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). The right, however, is not absolute. For example, a defendant does not have a constitutional right to present irrelevant evidence. *United States v. Carson*, 870 F.3d 584, 593 (7th Cir. 2017) (quoting *United States v. Beavers*, 756 F.3d 1044, 1052 (7th Cir. 2014)); *Morgan v. Krenke*, 232 F.3d 562, 566 (7th Cir. 2000) (citing *Taylor v.*

*Illinois*, 484 U.S. 400, 410 (1988)). And under certain circumstances a court may reasonably exclude even relevant evidence. *Sarfraz v. Smith*, 885 F.3d 1029, 1037 (7th Cir. 2018) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410. Thus, a defendant does not have a right to present evidence in violation of a state evidentiary rule unless that rule is "arbitrary or disproportionate to the purposes it is designed to serve, and the evidence implicates a sufficiently weighty interest of the accused." *Harris v. Thompson*, 698 F.3d 609, 626 (7th Cir. 2012) (quoting *United States v. Scheffer*, 523 U.S. 303, 308-09 (1998)) (brackets and quotation marks omitted).

Rose's son was only eleven-years-old at the time of the murders. Investigators interviewed him three times—on the day of the murders, roughly a month after the murders, and over two years after the murders. *Schmidt*, 2016 WI App 45, ¶55. He also testified at a preliminary hearing on October 3, 2012, about a year before the trial. *Id*. And then he testified at the trial. His statements changed over time, generally adding details that tended to incriminate Schmidt. *Id*. For example, although he testified at trial that he recognized the two voices and heard that the argument was about marijuana and money, these details were not included in his initial statements to the police. *Id.* at ¶15. Also, he testified at the preliminary hearing that he could not see the color of the truck but testified at trial that he remembered it was green and silver. (ECF No. 10-14 at 22, 27.)

Schmidt sought to introduce evidence that Rose's son's memory of a man and woman arguing with his mother the night before the murders might not be accurate. He proffered clinical psychologist David Thompson to testify about how inappropriate interviewing techniques might affect a child's memory. *Schmidt*, 2016 WI App 45, ¶¶56-60.

However, investigators did not record any of their interviews of Rose's son. Therefore, Dr. Thompson could not say whether investigators used any improper technique. Schmidt argued that the fact that Rose's son's statements changed over time supported the inference that investigators used improper interview techniques, and Dr. Thompson's testimony would help the jury understand why the statements may have changed.

The court of appeals rejected that argument. In its view, in the absence of any evidence that an improper technique was used, Dr. Thompson's testimony about how improper interview techniques might affect a child's memory was irrelevant. It concluded that excluding Dr. Thompson's testimony did not unconstitutionally deny Schmidt a right to present a defense, noting that Rose's son's testimony "was not the centerpiece of the State's case." *Schmidt*, 2016 WI App 45, ¶84. Nor was this a case where Dr. Thompson's testimony was necessary to counter a prosecution expert. *Id.* at ¶85 (distinguishing *State v. St. George*, 2002 WI 50, ¶63, 252 Wis. 2d 499, 643 N.W.2d 777).

The court of appeals also concluded that, even if the testimony was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. *Schmidt*, 2016 WI App 45, ¶86. It stated that there was a "very real potential that Thompson's testimony would mislead or confuse the jury by requiring them to speculate about what had occurred during the police interviews and elsewhere." *Id.* at ¶86.

The court of appeals' decision was not an unreasonable application of clearly established federal law. The exclusion of Dr. Thompson's testimony did not deny Schmidt his constitutional right to present a defense. In the absence of evidence that any improper interview technique was used in questioning Rose's son, testimony on how improper interview techniques might affect a child's memory was irrelevant. The fact that Rose's son's statement changed over time does not, by itself, support the inference that improper interview techniques were used by investigators. As Dr. Thompson acknowledged, a child's statement may change even absent improper interview techniques. (ECF No. 10-11 at 20.)

Setting aside the fact that there was no evidence that investigators used any of the techniques Dr. Thompson regarded as improper, Schmidt has not demonstrated that Dr. Thompson's conclusions about improper interview techniques would apply to an eleven-year-old boy like Rose's son. Dr. Thompson's testimony related primarily to children ages three through seven. (ECF No. 10-11 at 15-16.) He acknowledged, "It's much harder to influence an older child's memory than it is for a very young child's memory." Although

Dr. Thompson said that the research would be "very applicable to an 11 year old," he then hedged and said it would depend "on which principles and exactly what research we're talking about." (ECF No. 10-11 at 17.) (ECF No. 10-11 at 18.) He did not explain which specific opinions or research would apply to an 11-year-old boy.

Finally, even if the court were to accept that Dr. Thompson could have offered information as to child memory generally, *cf. Schmidt*, 2016 WI App 45, ¶87 (citing *Hampton v. State*, 92 Wis. 2d 450, 461, 285 N.W.2d 868, 873 (1979) (discussing the admission of an expert to discuss "the fallibility of human perception in general, not [the witness]'s perception in particular")), the court would conclude the testimony was reasonably excluded. The fallibility of a child's memory was evident from the fact that details in Rose's son's recollection changed over time. The jury would have learned merely that scientific studies support what was already clear from both the evidence in the case and common sense—a child's memory might not be accurate.

Moreover, Rose's son's testimony was a minor component in the state's case against Schmidt. Schmidt's undisputed motive, his contradictory explanations for his trip at the time of the murder, and his disposal of a firearm consistent with the murder weapon the day after the murder were far more probative of Schmidt's guilt than evidence that he and his wife were arguing with Rose the night before. This was not a situation where, if Dr. Thompson's testimony had been presented and believed, it would have likely resulted in Schmidt's acquittal. *Cf. Fischer v. Ozaukee Cty. Circuit Court*, 741 F.

Supp. 2d 944, 951 (E.D. Wis. 2010) (noting that the state court's exclusion of presenting certain evidence "must be closely examined" when it "resulted in the complete denial of a defense that, if believed, would have resulted in [the petitioner]'s acquittal"). Permitting a "trial within the trial" over why Rose's son's statements changed would have been disproportionate to the potential ends, and there would have been a significant risk of distracting the jury from what was really at issue. Therefore, the court concludes that Schmidt is not entitled to relief on this claim.

### b. Spousal Privilege

Wisconsin recognizes a spousal privilege whereby "[a] person has a privilege to prevent the person's spouse … from testifying against the person as to any private communication by one to the other made during their marriage…." Wis. Stat. § 905.05(1). The privilege is waived if the person "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Wis. Stat. § 905.11.

Schmidt argues that his statement to his wife that he wanted to shoot Rose and then himself was protected by the spousal privilege. The state courts concluded that Schmidt waived the privilege by acknowledging to investigators that he told his wife he wanted to shoot himself, although he told them he never said he wanted to first shoot Rose.

State evidentiary rulings generally are not cognizable claims for federal habeas relief. "Absent a showing that the admission of the evidence violated a specific

constitutional guarantee, a federal court can issue a writ of habeas corpus on the basis of

a state court evidentiary ruling only when that ruling violated the defendant's right to

due process by denying him a fundamentally fair trial." *Brown v. Watters*, 599 F.3d 602,

616 (7th Cir. 2010); *see also Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999).

> Is a violation of the state marital privilege so detrimental to a fair trial as to
> be a violation of due process? *See Bell v. Duckworth*, 861 F.2d 169, 170 (7th
> Cir. 1988), *cert. denied*, 489 U.S. 1088 (1989). The answer becomes clear when
> one considers that the purpose of the marital privilege is to exclude …
> relevant evidence in order to protect the institution of marriage. In other
> words, where the privilege applies, its goal of promoting marital harmony
> has been deemed to outweigh the *harm* it causes to the search for truth. 7
> John Wigmore, *Evidence in Trials at Common Law* § 2332 (McNaughton rev.
> ed. 1961). Clearly, recognition of the marital privilege is not necessary to
> afford due process. *See Port v. Heard*, 764 F.2d 423, 430 (5th Cir.
> 1985) ("The marital privilege has never been placed on a constitutional
> footing."); *United States v. Lefkowitz*, 618 F.2d 1313, 1319 (9th Cir.), *cert.
> denied*, 449 U.S. 824 (1980); *United States v. Doe*, 478 F.2d 194, 195 (1st Cir.
> 1973).

*Simpson v. Neal*, No. 90-3361, 1993 U.S. App. LEXIS 3198, at *8-9 (7th Cir. Feb. 24, 1993)

(unpublished) (emphasis in original); *see also United States v. Hull*, No. 2:02 CV 2 (2:99 CR

74), 2006 U.S. Dist. LEXIS 24224, at *11 (N.D. Ind. Mar. 21, 2006); *United States ex rel.*

*Simpson v. Neal*, 746 F. Supp. 780, 794 (N.D. Ill. 1990). Because admission of evidence in

violation of a state spousal privilege does not violate due process, Schmidt is not entitled

to relief on this claim.

### c. Sufficiency of the Evidence

"The applicable Supreme Court precedent regarding the sufficiency of the evidence is well established: 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Saxon v. Lashbrook*, 873 F.3d 982, 987-88 (7th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Schmidt does not dispute the sufficiency of the evidence to sustain his conviction of murdering Rose. He argues only that there was insufficient evidence to support his conviction for murdering Marsh.

As a preliminary matter, the court questions whether this claim is cognizable in habeas. Federal habeas relief is limited to persons who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The only relief a court may afford a habeas petitioner is to order his release from custody. Schmidt was sentenced to two consecutive life terms without the possibility of extended supervision. Even if the court were to find that he could not be incarcerated as a result of his conviction for murdering Marsh, he would still remain in prison for the rest of his life as a result of his conviction for murdering Rose. Consequently, there is no meaningful relief the court can offer Schmidt, *see Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991), and there is no reason for the court to intrude upon the sovereignty of the state and review its decision affirming Schmidt's convictions.

However, the respondent does not raise this issue, and the merits of Schmidt's claim are easily rejected. The logical and obvious inference is that whoever murdered Rose also murdered Marsh. To find otherwise would mean that, in the roughly 30-minute window when the murders must have occurred, two persons entered Rose's home and, both using 20-gauge shotguns, independently murdered Rose and Marsh. Moreover, the second murder must have occurred quickly after the first so as to prevent the surviving sibling from calling for help. The court of appeals reasonably found that this argument "strains credulity." *Schmidt*, 2016 WI App 45, ¶21. Therefore, Schmidt is not entitled to relief on this claim.

### 4. Conclusion

Having concluded that Schmidt is not entitled to relief on any claim presented in his petition, **IT IS THEREFORE RECOMMENDED** that Schmidt's petition for a writ of habeas corpus be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a) whereby written objections to any order herein or part thereof may be filed within fourteen days of service of this order. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin this 26th day of August, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge