DANIEL LEE SCHMIDT,

        Petitioner,

v.                                    Case No. 18-cv-29-pp

RANDALL HEPP,[1]

        Respondent.

**ORDER OVERRULING OBJECTIONS (DKT. NO. 26), ADOPTING JUDGE DUFFIN'S REPORT AND RECOMMENDATION (DKT. NO. 12), DENYING MOTION TO OBTAIN APPOINTED COUNSEL (DKT. NO. 27), DENYING *HABEAS* PETITION (DKT. NO. 1) AND DISMISSING CASE**

On January 5, 2018, the petitioner, an inmate at Waupun Correctional Institution who is representing himself, filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his 2014 conviction in Oconto County Circuit Court for two counts of first-degree intentional homicide. Dkt. No. 1; see also State v. Schmidt, Case No. 12CF000156 (Oconto County Circuit Court) (available at https://wcca.wicourts.gov). The clerk's office assigned the case to Magistrate Judge William Duffin. Dkt. No. 2. On August 26, 2019, Judge Duffin issued a report recommending that this court deny the petition. Dkt. No.

---

[1] The petitioner is incarcerated at Waupun Correctional Institution. See https://appsdoc.wi.gov /lop/home.do (last visited January 5, 2021). The warden of that institution is Randall Hepp. See https://doc.wi.gov/Pages/ OffenderInformation/AdultInstitutions/WaupunCorrectionalInstitution.aspx (last visited January 5, 2021). Under Rule 2(a) of the Rules Governing Section 2254 Cases and Fed. R. Civ. P. 25(d), the court has updated the case caption to reflect the appropriate respondent.

1

12. The petitioner filed objections on February 17, 2020. Dkt. No. 26. On June 22, 2020, the petitioner filed a motion asking the court to appoint him an attorney. Dkt. No. 27. The court will overrule the petitioner's objections, adopt Judge Duffin's report and recommendation, deny the motion asking for the appointment of an attorney, deny the petition and dismiss the case.

**I.    Background**

    A.    Facts

The petitioner does not object to the factual recitations in Judge Duffin's report, and this court adopts them.

> On the morning of May 19, 2009, Holly Kleczka arrived at the home of her friend, Kimberly Rose, in the rural town of Gillette, Wisconsin. She knocked but received no answer. The friends had spoken within the hour and Rose had told Kleczka she would leave the door unlocked; if she did not answer, Kleczka should just come in. Kleczka entered through the unlocked door, sat her two children on the couch, and turned the television on for them before continuing through the home, calling for her friend. Kleczka pushed open the partially closed door to Rose's bedroom and there found Rose, sitting on the floor against the wall, covered in blood, dead.
>
> Kleczka ran from the home, locked her children in her car, and called 911. Paramedics arrived, followed shortly thereafter by a police officer. After seeing Rose, the police officer told the paramedics to leave the home with him. It was only when other law enforcement officers arrived that they checked to see if anyone else was in the home. In doing so, they entered another bedroom and found a man lying on a mattress and covered with a blanket, seemingly asleep. The man did not respond to the officers' commands, and only after an officer removed the blanket did the officers recognize a hole in his back. Leonard Marsh, Rose's brother, was also dead. Rose had been shot once and Marsh three times, all with a 20-gauge shotgun.
>
> Investigators learned that Rose had talked to her mother from 10:12 to 10:19 AM that morning. When Rose's mom called back at 10:47 AM, there was no answer. Kleczka found Rose shortly thereafter. Because there were no signs of forced entry and it did not appear

2

anything was missing from the home, investigators suspected that they were murdered by someone who knew at least one of them.

Investigation into Rose's ex-boyfriend revealed he was over two hours away at the time of the murders. And Marsh's boyfriend, with whom Marsh had recently gotten into a fight, was also over two hours away. The investigation then turned to [the petitioner], with whom Rose had been having an affair.

[The petitioner's] wife, Stephanie, had recently found out about the affair. In an argument about the affair on May 15, four days before the murders, [the petitioner] told his wife, "I'd like to shoot her, then myself." (ECF No. 10-13 at 199.) Although [the petitioner] and Stephanie agreed to continue with their marriage despite the affair, Stephanie felt Rose was making it difficult. For example, Rose told Stephanie upsetting details of the affair, including that she and [the petitioner] had had sex in [the petitioner's] home and in Stephanie's car. On hearing that they had had sex in her car, on May 17, 2009, Stephanie drove to the farm where [the petitioner] worked and angrily confronted him, taking off her wedding ring and throwing it at him.

Also on May 17, 2009, Rose sent Stephanie a text message with words to the effect of "pay back is a bitch," attached to which was a photograph. Stephanie was unable to view the photograph on her phone but understood it was an image of [the petitioner] and Rose. Upon learning that Rose kept a journal that included details of her affair with [the petitioner], Stephanie demanded to see it. Stephanie arranged to get the journal from Rose on May 21. No such journal was found in Rose's home after her death.

Rose had also loaned [the petitioner] $1,000 for a motorcycle. The loan created tension between [the petitioner] and Stephanie because it required [the petitioner] to continue to have contact with Rose. Moreover, Stephanie had just lost her job, straining [their] ability to repay the loan. In light of [their] financial circumstances, Rose had agreed to accept an installment payment in the form of marijuana, which [the petitioner] grew in his garage. But Rose was dissatisfied with the quality and quantity of the marijuana and was demanding to be fully compensated.

The night before the murders, on May 18, 2009, Rose's 11-year-old son awoke at about 11:00 PM. He saw a man and a woman sitting on the couch in his home, arguing with his mother about money and marijuana. Although he was familiar with [the petitioner] and Stephanie, he could not see the faces of these visitors. Rose's son

went back to his room and looked outside. He saw a green and silver pickup truck in the driveway, which is consistent with the truck that [the petitioner] drove. However, Rose's son's recollection of this night varied over time. For example, at a preliminary hearing he testified that he could not see the color of the truck. Stephanie denied that she went to Rose's home that night.

Around this same time—roughly 11:00 PM on May 18, 2009—Marsh called a friend, asking her to pick him up from Rose's house. Marsh was very upset and crying. Marsh told his friend that a man and woman whom he did not like were at his house, and he wanted to leave. His friend could hear a woman telling Rose to "shut up" and heard some discussion about money. Marsh told his friend their names, but she could not recall them other than that the man's name was short and the woman's name was long. A few hours later, around 1:00 AM on the morning of May 19, Rose called Marsh's twin brother, asking him to pick up Marsh because she and Marsh were fighting. He refused, saying it was too late and too far of a drive.

On May 19, [the petitioner] got home from work as he usually did between 9:15 and 9:30 AM, and soon told Stephanie he was going to pick up their daughter from preschool. This struck Stephanie as odd because it was only 9:30 and their daughter did not need to be picked up until 11:00 AM. Nonetheless, [the petitioner] left, alone, and returned home at about 10:30 or 10:35, telling his wife he went for a drive to clear his mind. Uncharacteristically, when he returned he parked the car in the garage. A neighbor of [the petitioner and Stephanie] testified he saw [the petitioner] arrive home at 10:37 and park in the garage. [The petitioner] then left again at about 10:40 or 10:45, this time taking his pickup truck and the couple's young son to get their daughter from preschool. The drive from [the petitioner's] home to Rose's home would be about 21 minutes each way if the driver drove the speed limit and came to a complete stop at all stop signs.

Later, [the petitioner] told Stephanie that on his drive he went to a friend in a nearby town. He told her the route he took, and Stephanie went to businesses along the route to see if any surveillance camera might have captured images of his car. After a business reported to her that it reviewed its security footage but did not see the car, [the petitioner] told Stephanie that maybe he took a different route to his friend's house. He told investigators that he started to drive to a friend's house but realized he did not have enough time to make it back in time to get his daughter from preschool, and so turned around and went home.

4

> [The petitioner] had owned a 20-gauge shotgun. When questioned by law enforcement, he lied and said he had sold the gun years ago. [The petitioner] actually gave his 20-gauge shotgun to a friend the day after the murders, and the friend destroyed it.
>
> [The petitioner] was not charged until September of 2012, over three years later. Beginning on October 11, 2013, the state presented its circumstantial case against [the petitioner] to a jury.

Dkt. No. 12 at 1-6.

The petition explained that on direct appeal, the petitioner had argued that (1) insufficient evidence supported his conviction, (2) the circuit court erroneously found that he waived his right to marital privilege and (3) the circuit court "erroneously and unconstitutionally excluded expert witness testimony." Dkt. No. 1 at 3. The petition indicated that after the Wisconsin Court of Appeals affirmed the convictions, the petitioner sought review of the same issues in the Wisconsin Supreme Court. Id. The petitioner stated that he filed a postconviction motion for a new trial in the Oconto County Circuit Court, that the court denied the motion in February of 2015 and that he did not appeal that denial through the Wisconsin Supreme Court. Dkt. No. 1 at 4-5.

B.   Petition (Dkt. No. 1)

The petition asserts three grounds for relief: (1) the circuit court denied the petitioner his right to present a defense when it "refused to let him present testimony from a child psychologist regarding child memory," (2) the circuit court erred when it found that the petitioner waived a spousal privilege and (3) insufficiency of the evidence. Dkt. No. 1 at 6-8; Dkt. No. 12 at 6. On February 22, 2018, Judge Duffin screened the petition under Rule 4 of the Rules

5

Governing Section 2254 Cases and allowed the petitioner to proceed on each of his claims. Dkt. No. 5. Judge Duffin's screening order also set a briefing schedule:

> Within **60 days** of the date of this order, the respondent shall either answer the petition in accordance with Rule 5 of the Rules Governing Section 2254 Cases or file a motion to dismiss. An optional supplemental brief in opposition to the petition may be filed along with the answer to the petition.
>
> Within **28 days** of the respondent's answer or motion to dismiss, the petitioner shall submit a brief in response.
>
> In the event the respondent files a motion to dismiss, the respondent shall have **14 days** from the petitioner's response in which to file a reply.
>
> Unless the court determines that additional proceedings are necessary, this shall conclude the briefing in this matter. The court will then resolve the petition on the written record.

Id. at 2-3.

The respondent answered the petition on May 23, 2018. Dkt. No. 10. On June 11, 2018, this court referred the case to Judge Duffin for a report and recommendation. Dkt. No. 11. Although Judge Duffin's briefing schedule gave the petitioner twenty-eight days to file a brief in response to the respondent's answer—until June 20, 2018—the petitioner never filed a brief.

C. Report and Recommendation (Dkt. No. 12)

On August 26, 2019, Judge Duffin issued his report, recommending that this court deny the petition. Dkt. No. 12. Judge Duffin reviewed the facts underlying the offense, id. at 1-6, the petitioner's state court proceedings, id. at 6, and the merits of the petition, id. at 7-15. Judge Duffin explained that under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "a federal

6

court generally may grant habeas relief only if the state court decision was 'either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Id. at 7 (quoting Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014); U.S.C. § 2254(d)(1), (2)).

The report and recommendation provided the facts underlying the petitioner's right to present a defense claim:

> Rose's son was only eleven-years-old at the time of the murders. Investigators interviewed him three times—on the day of the murders, roughly a month after the murders, and over two years after the murders. *Schmidt,* 2016 WI App 45, ¶55. He also testified at a preliminary hearing on October 3, 2012, about a year before the trial. *Id.* And then he testified at the trial. His statements changed over time, generally adding details that tended to incriminate [the petitioner]. *Id.* For example, although he testified at trial that he recognized the two voices and heard that the argument was about marijuana and money, these details were not included in his initial statements to the police. *Id.* at ¶15. Also, he testified at the preliminary hearing that he could not see the color of the truck but testified at trial that he remembered it was green and silver. (ECF No. 10-14 at 22, 27.)
>
> [The petitioner] sought to introduce evidence that Rose's son's memory of a man and woman arguing with his mother the night before the murders might not be accurate. He proffered clinical psychologist David Thompson to testify about how inappropriate interviewing techniques might affect a child's memory. *Schmidt,* 2016 WI App 45, ¶¶56- 60.
>
> However, investigators did not record any of their interviews of Rose's son. Therefore, Dr. Thompson could not say whether investigators used any improper technique. [The petitioner] argued that the fact that Rose's son's statements changed over time supported the inference that investigators used improper interview techniques, and Dr. Thompson's testimony would help the jury understand why the statements may have changed.

7

Id. at 8-9.

Judge Duffin concluded that the Wisconsin Court of Appeals did not unreasonably apply clearly established federal law when it rejected the petitioner's claim that the circuit court's exclusion of Dr. Thompson's testimony constituted a denial of the petitioner's right to present a defense. Id. at 10. Judge Duffin noted the Court of Appeals' conclusions that (1) Dr. Thompson's testimony was irrelevant due to "the absence of any evidence that an improper technique was used," id. at 9; (2) Dr. Thompson's testimony was not necessary to counter expert testimony on behalf of the State, id.; and (3) even if Dr. Thompson's testimony had been relevant, "its probative value was substantially outweighed by the danger of unfair prejudice," such as the "very real potential that Thompson's testimony would mislead or confuse the jury by requiring them to speculate about what had occurred," id. at 10 (citing State v. Schmidt, 370 Wis. 2d 139, 184 (Ct. App. 2016)).

Judge Duffin agreed that "[t]he exclusion of Dr. Thompson's testimony did not deny [the petitioner] his constitutional right to present a defense," reasoning that (1) absent evidence that investigators used "any improper interview technique" in questioning Rose's son, "testimony on how improper interview techniques might affect a child's memory was irrelevant," id.; (2) the changes in Rose's son's statement over time, standing alone, did not "support the inference that improper interview techniques were used by investigators," id.; (3) "a child's statement may change even absent improper interview techniques," id.; (4) the petitioner did not demonstrate "that Dr. Thompson's

8

conclusions about improper interview techniques would apply to an eleven-year-old boy like Rose's son," id.; (5) even if Dr. Thompson's testimony applied to Rose's son, the circuit court reasonably excluded it because it would have showed only that "a child's memory might not be accurate," id. at 11; and (6) "Rose's son's testimony was a minor component in the state's case against [the petitioner,]" and therefore, even if Dr. Thompson's testimony "had been presented and believed, it would [not] have likely resulted in [the petitioner's] acquittal," id.

Judge Duffin recounted the facts underlying the petitioner's argument that the circuit court erroneously concluded that he had waived a spousal privilege:

> Wisconsin recognizes a spousal privilege whereby "[a] person has a privilege to prevent the person's spouse . . . from testifying against the person as to any private communication by one to the other made during their marriage . . . ." Wis. Stat. § 905.05(1). The privilege is waived if the person "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Wis. Stat. § 905.11.
>
> [The petitioner] argues that his statement to his wife that he wanted to shoot Rose and then himself was protected by the spousal privilege. The state courts concluded that [the petitioner] waived the privilege by acknowledging to investigators that he told his wife he wanted to shoot himself, although he told them he never said he wanted to first shoot Rose.

Id. at 12.

Because Judge Duffin found that "admission of evidence in violation of a state spousal privilege does not violate due process," he concluded that the petitioner was not entitled to relief on this claim. Id. at 13.

9

Regarding the sufficiency of the evidence, Judge Duffin observed that the petitioner challenged only the sufficiency of the evidence to sustain his conviction for murdering Leonard Marsh; the petitioner did not challenge the sufficiency of the evidence to sustain his conviction for murdering Rose. Id. at 14. Judge Duffin questioned whether that claim was cognizable on *habeas* review when "[t]he only relief a court may afford a habeas petitioner is to order his release from custody." Id. Judge Duffin noted that "[e]ven if the court were to find that [the petitioner] could not be incarcerated as a result of his conviction for murdering Marsh, he would still remain in prison for the rest of his life as a result of his conviction for murdering Rose." Id. Consequently, Judge Duffin found that there was "no meaningful relief the court [could] offer [the petitioner], see *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991), and there [was] no reason for the court to intrude upon the sovereignty of the state and review its decision affirming [the petitioner's] convictions." Id.

Noting that the respondent did not challenge the petitioner's sufficiency of the evidence claim on this basis, Judge Duffin also addressed the claim's merits, finding them "easily rejected." Id. at 15. Judge Duffin concluded that "[t]he logical and obvious inference is that whoever murdered Rose also murdered Marsh." Id. He determined that the Court of Appeals reasonably found that any other conclusion "strain[ed] credulity," id. (citing Schmidt, 370 Wis. 2d 139 at 153), and that the petitioner was "not entitled to relief on this claim," id.

D.     Objections (Dkt. No. 26)

The petitioner argues that under a proper interpretation of Wisconsin law, Dr. Thompson's testimony was relevant. Dkt. No. 26 at 1-4. Contending that the testimony was admissible under Federal Rule of Evidence 702, and that Wisconsin has amended its "law on the admissibility of expert testimony consistent with" the federal rules, id. at 4-5 (quoting State v. Giese, 356 Wis. 2d 796, 805 (Ct. App. 2014)), the petitioner asserts that the circuit court should have admitted the testimony. The petitioner argues that Dr. Thompson's testimony was necessary for his defense, id. at 6, because (1) it could have impeached Rose's son's testimony, id. at 6-7; (2) under state law, "[i]nformation is necessary to the defense if it tends to support the theory of defense which the defendant intends to assert at trial," id. at 7 (quoting State v. Schaefer, 308 Wis. 2d 279, 317 (2008)); and (3) the petitioner raised an identity defense at trial, and therefore "any evidence tending to cast doubt on the State's contention he was the killer was necessary to support his theory," id.

The petitioner asserts that the respondent misconstrues state law regarding spousal privilege, which he contends is unclear. Id. at 10-11. He argues in the alternative that the court should disregard state law and "support[] the marital privilege" for policy reasons. Id. at 11. The petitioner argues that federal common law recognizes marital privileges. Id. at 11-12. He adds that "disclosure of the statement was first made to police by [his wife], and then they confronted [him] with it during an interrogation." Id. at 12. The petitioner urges that insufficient evidence supports his conviction for killing

11

Leonard Marsh; he stresses that this conviction rests on mere inferences, and that "Mr. Marsh's death cannot be lumped together with his sister's death in the res ipsa loquitur fashion the state espouses." Id. at 13-16.

## II. Analysis

### A. Standard

Under Rule 12 of the Rules Governing Section 2254 Cases, the Federal Rules of Civil Procedure apply in *habeas* cases. Rule 72(b)(1) allows a district court to refer a case to a magistrate judge, who then "conduct[s] the required proceedings," and "enter[s] a recommended disposition." Fed. R. Civ. P. 72(b)(1). A dissatisfied party has fourteen days from the date the magistrate judge issues the recommendation to file "specific written objections." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. §636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specific proposed findings or recommendations to which an objection is made"). The petitioner must specify "each issue for which review is sought," but need not specify "the factual or legal basis of the objection." Johnson v. Zema Sys. Corp., 170 F.3d 734, 741 (7th Cir. 1999). The district court is required to conduct a *de novo* review "only of those portions of the magistrate judge's disposition to which specific written objection is made." Id. at 739. "If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error." Id. (citations omitted). "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been

12

made." Wees v. Samsung Heavy Indus. Co. Ltd., 126 F.3d 925, 943 (7th Cir. 1997).

B. Application

While the petitioner filed a document titled "Petitioners Objections to August 26th, 2019 Magistrate Judge's Report and Recommendation," the document does not address any of Judge Duffin's rulings. He does not rebut Judge Duffin's conclusions that the Wisconsin Court of Appeals did not unreasonably apply federal law in rejecting the petitioner's claims, that the petitioner's claims are not cognizable on *habeas* review or that the petitioner is otherwise not entitled to relief. Instead, the petitioner cites, and responds to, the *state's* brief filed in the Wisconsin Court of Appeals during the petitioner's direct appeal (a document the respondent had attached to his answer, Dkt. No. 10-3). See Dkt. No. 26 at 2, 6, 8-10, 13-14, 16. Because the petitioner has not objected to any specific portions of *Judge Duffin's* report and recommendation, the court reviews that report and recommendation for clear error. None of Judge Duffin's conclusions were clearly erroneous. The petitioner's objections reiterate his disagreement with the state's arguments made on his direct appeal. Those disagreements are not a basis for *habeas* relief.

Even if the court reviewed Judge Duffin's report and recommendation under a *de novo* standard, it would agree with Judge Duffin's conclusions. The exclusion of Dr. Thompson's testimony did not deny the petitioner his constitutional right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or

13

Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324, (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). This right, however, is not absolute. A criminal defendant does not have a constitutional right to present irrelevant evidence. United States v. Carson, 870 F.3d 584, 593 (7th Cir. 2017) (quoting United States v. Beavers, 756 F.3d 1044, 1052 (7th Cir. 2014)); Morgan v. Krenke, 232 F.3d 562, 566 (7th Cir. 2000) (citing Taylor v. Illinois, 484 U.S. 400, 410 (1988)). Under certain circumstances, a court may exclude relevant evidence. Sarfraz v. Smith, 885 F.3d 1029, 1037 (7th Cir. 2018) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)). A criminal defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410. Thus, a criminal defendant cannot circumvent a state evidentiary rule in order to present evidence unless that rule is "arbitrary or disproportionate to the purposes [it is] designed to serve, and the evidence implicates a sufficiently weighty interest of the accused." Harris v. Thompson, 698 F.3d 609, 626 (7th Cir. 2012) (quoting United States v. Scheffer, 523 U.S. 303, 308-09 (1998)) (quotations omitted).

Because there was no evidence presented at the petitioner's trial to indicate that law enforcement used improper interview techniques in interviewing Rose's son, the court cannot find that the Wisconsin Court of Appeals made an unreasonable determination of the facts in light of the

14

evidence presented, or that its affirmation of the circuit court's exclusion of testimony regarding the potential effect of improper interview techniques on a witness's testimony was contrary to, or involved an unreasonable application of, clearly established federal law. The Court of Appeals reasonably concluded that even if the testimony was relevant, the risk of unfair prejudice outweighed the testimony's probative value.

Under Wisconsin law, "[a] person has a privilege to prevent the person's spouse . . . from testifying against the person as to any private communication by one to the other made during their marriage." Wis. Stat. §905.05(1). A person waives that privilege if the person "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Wis. Stat. §905.11. "Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court can issue a writ of habeas corpus on the basis of a state court evidentiary ruling only when that ruling violated the defendant's right to due process by denying him a fundamentally fair trial." Brown v. Watters, 599 F.3d 602, 616 (7th Cir. 2010).

The Wisconsin Court of Appeals concluded that the petitioner waived the marital privilege through his statements to investigators. Dkt. No. 10-5 at 22. This court is unaware of any federal law as determined by the United States Supreme Court clearly establishing that such a conclusion is unconstitutional. Further, the petitioner does not present, and the court is not aware of, any basis for concluding that an admission of evidence in violation of Wisconsin's spousal privilege statute constitutes a violation of due process under the

15

United States Constitution. The Court of Appeals' decision was neither contrary to or involved an unreasonable application of clearly established federal law.

"The applicable Supreme Court precedent regarding the sufficiency of the evidence is well established: 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Saxon v. Lashbrook, 873 F.3d 982, 987-88 (7th Cir. 2017) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The petitioner does not dispute the sufficiency of the evidence supporting his conviction for murdering Rose; he challenges only the evidence supporting his conviction for murdering Leonard Marsh. See dkt. no. 1 at 8; dkt. no. 26 at 13. Because Rose and Marsh were found dead in the same home and at the same time and because both died of gunshot wounds, a rational trier of fact could conclude that the person who killed Rose also killed Marsh. The Court of Appeals' conclusion that the evidence was sufficient was neither contrary to or involved an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The court will overrule the petitioner's objections and will adopt Judge Duffin's recommendation and dismiss the petition.

### III. Motion to Obtain Appointed Counsel (Dkt. No. 27)

The petitioner asks the court to appoint him an attorney to litigate the *habeas* petition. Dkt. No. 27. He states that he is indigent and has no legal education. Id. at 1. The petitioner contends that because he lacks legal

16

knowledge, he never knew he could file a brief. Id. at 2. He says that due to lockdowns and other restrictions in the prison, he has been unable to consult the library for several months. Id.

There is no statutory or constitutional right to court-appointed counsel in federal civil litigation. Giles v. Godinez, 914 F.3d 1040, 1052 (7th Cir. 2019). This is particularly true in *habeas* cases. The Seventh Circuit has held that "[a] litigant is not entitled to appointed counsel in a federal postconviction proceeding," although it notes that a district court "may appoint counsel if 'the interests of justice so require.'" Taylor v. Knight, 223 F. App'x 503, 504 (7th Cir. 2007) (citations omitted) (quoting 18 U.S.C. §3006A(a)(2)(B)).

When evaluating a motion to appoint counsel, the district court engages in a two-step process. Giles, 914 F.3d at 1052. First, the court determines whether the plaintiff "made a reasonable attempt to secure counsel on his own." Id. at 1053 (citing Navejar v. Iyiola, 718 F.3d 692, 696 (7th Cir. 2013)). Second, the court determines "whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a lay person to coherently present it." Pruitt v. Mote, 503 F.3d 647, 655 (7th Cir. 2007).

The petitioner has not shown that he made any attempt to contact an attorney on his own, so he has not taken the first step in the two-step process. Even if the petitioner had taken the first step, however, the court would not appoint counsel. The petitioner filed a petition that clearly explained his constitutional claims, filed several motions for extensions of time (which the court granted), filed objections to Judge Duffin's report and recommendations

17

and filed this motion to appoint counsel. Every one of the petitioner's pleadings has been clear, detailed and legible—he has better grammar, spelling and writing skills than most inmates from whom the court receives pleadings. The court has been able to follow his arguments. He has cited case law and rules and evidence standards. As for his argument that he did not know he could file a brief, the petitioner did not need to be a lawyer or have legal experience to know that he could file a brief; Judge Duffin told him that he could (in fact, ordered that he should), right in the screening order. Dkt. No. 5 at 2 ("Within **28 days** of the respondent's answer or motion to dismiss, the petitioner shall submit a brief in response.") The petitioner explains in detail the effect of lockdowns on his ability to use the prison library and the court has no reason to doubt that his library access (like that of almost all inmates in all facilities, given pandemic restrictions) has been severely limited. But as the petitioner himself notes, the court granted him extension after extension for just that reason.

*Habeas corpus* relief is extraordinary relief. By the time a petitioner seeks *habeas* relief, the appellate courts of his state have ruled on the issues he raises. It is fairly rare for a petitioner to convince a federal court that those state courts unreasonably applied federal law or made an unreasonable determination of the facts based on the evidence in the case. The petitioner did a good job articulating his arguments. He simply has not demonstrated, despite the quality of his arguments, that the Wisconsin Court of Appeals' decision constituted an unreasonable application of the law or facts, and he

18

has not demonstrated that Judge Duffin's recommendation is erroneous. The court will deny the motion.

**IV.  Certificate of Appealability**

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability because no reasonable jurist could debate that the petitioner is not entitled to relief under 28 U.S.C. §2254.

**V.  Conclusion**

The court **OVERRULES** the petitioner's objection. Dkt. No. 26.

The court **ADOPTS** Judge Duffin's report and recommendation in full. Dkt. No. 12.

The court **DENIES** the petition's motion to obtain appointed counsel. Dkt. No. 27.

The court **DENIES** the petition for writ of *habeas corpus* and **DISMISSES** this case. The clerk will enter judgment accordingly.

19

Case 2:18-cv-00029-PP   Filed 01/05/21   Page 19 of 20   Document 28

The court **DECLINES** to issue a certificate of appealability.

Dated in Milwaukee, Wisconsin this 5th day of January, 2021.

                                      **BY THE COURT:**

                                      **HON. PAMELA PEPPER**
                                      **Chief United States District Judge**